WILLIAM M. TENNILLE, plaintiff in error, *vs.* LUCY PHELPS *et al.*, defendants in error.

A testatrix made her will in 1863 and died. By one item of her will, she directed her executors to keep up her plantation in Quitman county, and work her slaves thereon, declaring that she desired this to be done "for the purposes hereinafter to be mentioned." In the same item she directed her executors, in case the plantation should be unprofitable, or there should be danger of a depreciation or loss of her property, to sell the same, in their discretion, and invest the proceeds in interest bearing securities. In the next item, she gave certain amounts of money to her nephews and nieces, "to be paid out of the plantation, without interest, after paying all expenses arising from its prudent management." In another item, she gave all the use of her estate to her son, her only living child, appointing her husband his guardian, and directing that her husband should hold the property as trustee for her son, and receive the profits in trust for his use during the life of the husband, but without accountability, he to preserve the *corpus* of the estate for the son. She appointed her husband and his brother her executors. The testatrix died in 1864. The slaves were emancipated, and it then became impracticable to carry out the scheme of working the plantation with the slaves, and thus raising the means to pay these legacies:

*Held*, That, taking the whole will together, the testatrix intended the legacies to her nephews and nieces to be paid only out of the profits to be made by working the slaves upon the land, and that, as this became impossible on the emancipation of the slaves, the legacies to the nephews and nieces fail with the failure of the fund, and the *corpus* of the estate went to the son free from any charge to pay the legacies to said nephews and nieces.

*Tennille vs. Phelps et al.*

Wills. Legacies. Before Judge KIDDOO. Quitman Superior Court. May Term, 1873.

Lucy Phelps and Fannie Phelps, by their next friend, David Phelps, Nathan Belton, Mary F. Howard, formerly Belton, and Frank Armstrong and Hewitt Armstrong, by their next friend, S. D. Belton, filed their bill against William M. Tennille, Delaware Morris, administrator, *cum testamento annexo*, of Lucy M. Tennille, John F. Webb, one of the securities of the administrator, and William Harrison and Theodore L. Guerry, executors of James Harrison, deceased, the other security, making substantially the following case:

Lucy M. Tennille died in 1864, leaving a will, the only material portions of which are as follows:

Item 1st. Does not relate to property, but expresses the christian faith and hope of the testatrix.

Item 2d. Directs her executors to pay just debts and demands, that those to whom she may be indebted shall get their own as soon as her executors shall find it convenient; and for this purpose, authorizes them to use any funds which may be on hand at her death, or which may come to their hands from collection, or which may accrue by virtue of any of the provisions of the will.

Item 3d. Directs the sale of her residence in Columbus, and the application of the proceeds to the payment of her debts, the improvement of her plantation, or such other investments as the executors, in their judgment, think best.

Item 4th. "It is my will, and I hereby direct that my executors shall keep my plantation in the county of Quitman, in this State, and that the same shall be cultivated, with my slaves thereon, for the purposes hereinafter mentioned; unless, however, my slaves be dissatisfied, and from any cause involving or threatening a great depreciation in their value or loss, or if my said farm shall become unprofitable. In any of these events, to be judged of by my executors, they are hereby authorized to sell and dispose of the whole of my estate, both real and personal, in such way and manner as they shall judge

will best contribute to the interests of my estate, and my executors are hereby authorized to invest the money arising from said sale in safe and interest-paying securities. I further direct that my executors, if it is practicable, shall permit my slaves, in the event they shall make sale, to select their owners, who may be willing to pay a fair price for them, and, as far as practicable, to sell them in families."

Item 5th. "I hereby give and bequeath to Nathan Belton, the son of my brother Solomon D. Belton, the sum of $1,000 00, to him and his heirs and assigns forever. I also give to Mary Fannie, the daughter of my said brother, the sum of $1,000 00, to have and to hold to her in trust, for her sole use and benefit, as her sole and separate estate, for and during her natural life, and not in any way or manner to be made liable for the debts or contracts of her present, or of any future husband, and at her death to be equally divided among her children, who may be living at the time of her death, to hold to them and their heirs and assigns forever. I also give to Fannie Phelps and Lucy Phelps, daughters of Laura and David Phelps, the sum of $1,000 00 each, as their sole and separate estate, for their sole use and benefit during their life, and at their deaths to go to and be equally divided between their children, (each family for itself,) who may be living at their death. I also give to Hewitt Armstrong and his brothers, sons of Lucy Armstrong, the sum of $500 00 each. I also give a child named Lucy Tennille, a daughter of Nancy Smith, of Quitman county, and who is a daughter of William Drake, my overseer, the sum of $300 00, to be expended in her education. It is my wish, and I hereby direct, that the foregoing bequests in these items made, shall be paid out of the property and income of my plantation, (without interest) whenever my executors shall see proper, and can conveniently spare the same, after paying all the expenses necessarily arising from a prudent management of said plantation, and in the event of the death of any of the aforesaid females before their maturity, or having no child or children at the

time of their death, then said bequests shall go to their brothers and sisters in equal shares."

Item 6th. Gives to Tennille Patterson, to be paid as soon as the condition of the estate, in the judgment of the executors, will permit, $2,000 00.

Item 7th. Gives certain negroes to the children of her brother Solomon D. Belton, and certain lands in Butler county, Alabama, already in his possession, with directions.

Item 8th. Relates to an afflicted servant, Dora, and her mother, giving directions, etc.

Item 9th. "I give and bequeath to my beloved son William Meiggs Tennille, all the rest and residue of my estate of whatsoever character the same may be, to have and to hold to him, his heirs and assigns forever, subject, however, to the following incumbrances, conditions and provisions, to-wit: that my beloved husband shall have the control and management of my whole estate, for and during his life, with the power and authority to plant and gather the crops, and control the slaves and other property, sell and dispose of the crops, and receive the proceeds arising from the sale during his life, in trust for my said son, without accountability for the use of the same, so that no unnecessary waste shall be committed, nor shall the same be subject to be taken for any debts or liabilities against him at the date hereof. And I do hereby appoint him as my testamentary guardian of my said son, during his minority, not doubting that my said beloved husband, from his age and experience, will manage and control said estate for the best interest of our said son, before and after his maturity, for and during the life of may said husband. And if my said son shall die before his said father, my said husband, he shall continue to manage my said estate in connection with my other executor, Francis A. Tennille, my husband's brother, who shall manage the same together in the same way and manner aforesaid. Provided, my said husband, from his age or debility, shall at any time require his said brother's assistance, taking and receiving to himself, however, the proceeds arising from my said estate, for the support

and in trust for my said son, and preserving the *corpus* of the property, in case of his, my son's death, for the benefit of the wife and children of my said son, if he should have any at his death, or in default thereof, for the benefit of the bequest hereinafter made."

Item 10th. Provides that in the event her said son should die without wife, child or children, living at the time of his death, and after the death of her husband, she gives as follows: To Hyacynth Garrett and Grace F. Garrett, of Virginia, each, $1,000 00 ; to the Orphan Asylum of Columbus, $1,000 00 ; to the poor of the Methodist Church at Columbus, $500 00, to be paid in annual sums of $100 00 ; to Lucy M. Emory, of Baldwin, $1,000 00; to Miss W. Tison, of Griffin, $500 00; to the Southern Bible Society the sum of $1,000 00 ; to the Tract Society of which the Methodist Episcopal Church, South, may be connected, $1,000 00 ; to the China Mission of said Church, $1,000 00; John Simmons, California Missionary, $1,000 00; Georgia Conference, for negro missions, $1,000 00; to the wife and children of Rolla Green, $1,000 00 ; to Lucy Tennille Vincen, of Columbus, $1,000 00 ; to George Adams, a wounded soldier, $500 00.   All these sums in this item mentioned to be paid in the manner specified, by her executor, or the legal representative having her estate in charge and keeping, after the emergency may' occur upon which said bequests are predicated—that is to say, upon the death of her son, without wife or child or children living at the time of his death, and after the death of her said husband.   And in the event such contingency should happen, she gives and bequeaths the residue of her estate to the next of kin of her said son, to have and to hold to them, their heirs and assigns forever.

Item 11th. Gives direction as to the instruction and management of the slaves.

Item 12th. Appoints her husband, William A. Tennille, and his brother, Francis A. Tennille, executors, and William A. Tennille testamentary guardian and as trustee of William M. Tennille.

Tennille *vs.* Phelps *et al.*

The executors appointed by the will failed to qualify, and the defendant, Delaware Morris, was appointed administrator *cum testamento annexo*, and gave bond in the sum of $300,-000 00, with John N. Webb and James Harrison as securities, for the faithful execution of the trust. James Harrison has since died, and the defendants, William Harrison and Theodore L. Guerry, have qualified as his executors.

Complainants claim as the legatees set forth in the fifth item of said will. The administrator received sufficient assets to have paid to them said absolute legacies. He has turned over to the defendant, William M. Tennille, the residuary legatee, a plantation of the value of $10,000 00, said legatee receiving the same, though well aware of the fact that complainants were still unpaid. While the said Lucy and Fannie Phelps, and the said Mary F. Howard and Nathan Belton were residents of the State of Alabama, and the said Hewitt and Frank L. Armstrong were residents of the State of Louisiana, the said Mary F. being a *feme covert*, and the said Lucy, Fannie, Hewitt and Frank, minors, the said administrator applied for, and, at the May term, 1870, of the Court of Ordinary of Quitman county, obtained letters of dismission. This was without the knowledge or consent of complainants, and in fraud of their rights. Said administrator is insolvent, and beyond the aforesaid plantation there are no visible assets belonging to the estate of testatrix. William A. Tennille, the husband of testatrix, died in the latter part of 1864.

Waiving all discovery, complainants pray that they may have a decree against said administrator and his securities for the several legacies mentioned in the fifth item of said will, with interest on the same from such time as it may appear to the Court that said administrator ought to have paid the same. Pray similar decree against William M. Tennille, the residuary legatee, and that said plantation may be held subject to the payment of said decree, and that he, in the meantime, be enjoined from disposing of the same. That the writ of subpœna may issue.

The bill was filed on April 15th, 1872.

The answers of the defendants are omitted as unnecessary to an understanding of the decision.

Pending the trial, the evidence disclosed the fact that Mary F. Howard and Nathan Belton were over thirty years of age at the time of the discharge of Delaware Morris, administrator *cum testamento annexo* as aforesaid, and that the other complainants were minors. Upon motion of solicitors for complainant, the bill was dismissed as to the said Mary F. and Nathan.

The allegation in the bill· that the discharge aforesaid was obtained by fraud, was abandoned. It was shown that said administrator and said William M. Tennille knew that the legacies to complainants had not been paid when said property was turned over to the residuary legatee; that the question of the payment of said legacies was discussed with the Ordinary at the time said discharge was granted, and that he advised the administrator that they were not payable, as the testamentary scheme had been destroyed by the emancipation of the slaves. The non-residence of John N. Webb, security on the administrator's bond, and the non-residence and bankruptcy of Delaware Morris, the administrator, were shown; also, that William M. Tennille, the residuary legatee, had become of age before said property was turned over to him; the death of the testatrix and the probate of the will in the year 1864; the death of the husband of testatrix in the latter part of the same year; the discharge of the administrator at the May term, 1870, of the Court of Ordinary; that the plantation before referred to was worth more than the legacies in controversy.

The following receipt was also placed in evidence:

"Received, Georgetown, Georgia, October 22d, 1869, of Delaware Morris, administrator of L. M. Tennille, deceased, the sum of twenty-two thousand dollars in full and complete settlement of all acts and liabilities in said estate, and guarantee to him and his securities full and perfect discharge from

Tennille *vs.* Phelps *et al.*

the same; all outstanding liabilities of the estate to be settled
by myself.        (Signed)

WILLIAM M. TENNILLE."

"Signed and authorized in presence of
       (Signed)        "J. T. HILL,
                "W. J. JORDAN, Ordinary."

It was also shown that a part of the $22,000 00 receipted
for was personal property on the said plantation.

The Court, amongst other things, charged the jury as fol-
lows: "The legacies to the complainants in this case, in the
opinion of the Court, are absolute general legacies, directed
to be paid out of the profits and income of the plantation of
the testatrix, without interest, whenever her executors shall
see proper, or when a reasonable time to carry out these pro-
visions in the manner pointed out had elapsed.   But if you
believe from the evidence that the administrator, knowing of
the claims of the complainants, did turn over to the residuary
legatee, the whole estate which came into his hands, includ-
ing the plantation described in the fifth item of the will, and
had not paid to these complainants the sums bequeathed to
them, then he committed a *devastavit* in so doing, and he and
his securities would be liable to each of the complainants for
the amount of his or her legacy, with interest from the date
he so turned over the estate to the residuary legatee.   It is,
and was the duty of the administrator, under the law, to carry
out the provisions of the will, and the moment he turned over
said plantation and thus placed it out of his power to receive
any profits and income from the same, he became liable to the
complainants.   The destruction of the property in negroes
who were expected to cultivate the plantation, did not, of
itself, prevent profits and income arising therefrom, and if it
became unprofitable, it is provided by the fourth item of the
will that the executor is authorized to sell the whole estate
and invest the proceeds in safe securities, and had he done so
these legacies could have been paid out of the profits and in-
come thereof, and they should have been before the property

was turned over to the residuary legatee. The administrator had no right to turn it over until complainants had been paid from the profits and income, and he and his securities became liable if he did so. If William M. Tennille had full knowledge of the claim of these complainants before he received the plantation, he is also liable to them."

The jury returned a verdict for the complainants against all of the defendants for the principal amounts of their respective legacies, with interest thereon from October 22d, 1869.

The defendants moved for a new trial, because the verdict was contrary to the evidence and to equity, and because of error in the charge. The motion was overruled, and the defendant, William M. Tennille, excepted.

HERBERT FIELDER; JAMES H. GUERRY, for plaintiff in error.

JOHN T. CLARKE, for defendants.

McCAY, Judge.

The real question in this case is, what is the meaning of Mrs. Tennille's will, as respects the rights of the legatees filing the bill? Were the legacies given to them money legacies? Were the directions to pay them out of the profits of the plantation only directory and demonstrative? Or were they, in the nature of specific legacies, not payable at all if the fund provided should fail? The Court below held the former. Was that error?

In the construction of wills, the great thing to be sought for is the intention of the testator. The whole will is to be looked to, and all its parts to be harmonized, if possible. The surroundings of the testator are to be considered, the objects of his bounty, his family relations, the nature and extent of his estate, etc. If there be any doubt arising from the mere words of any clause, all the circumstances alluded to may be considered in resolving it. These are not only principles well

settled by the authorities, but are the positive enactments of our own Code: Irwin's Code, secs. 2420, 2421. As a general rule, it is true that a gift of money, to be paid from a specified fund is, nevertheless, a general legacy, and a failure of the fund does not destroy the legacy: Code, sec. 2422. But it is unquestionably true that a testator *may* so charge a money legacy upon a particular fund as to make the legacy follow the fate of the fund. To say the contrary, would be to hold that a testator has not a right to make such a disposition of his property as he pleases; that if he has a horse, he may give it to A, and the legacy fails if the horse die before the testator; but if he have a particular fund and give that, he cannot so give it as that if the fund fail, the legacy also fails.

All that the rule means is, that where a general money legacy is given, the testator is not to be presumed to have intended to make it dependent upon the existence of a fund merely because he has indicated that it is to be paid out of that fund. On the contrary, if the will gives a money legacy, and a particular fund is charged with the payment of it, the presumption is that this only indicates an intention to furnish an additional security for its payment; since, if the fund charged is sufficient, the legacy shall not abate, though the condition of the estate is such that other general legacies are compelled to abate: 3 Vesey, Jr., 640; 5 *Ibid.*, 206. But, to make out a case of this kind, the will must show that the testator intended a general money legacy. Nor does it at all follow because a legacy is expressed in dollars that it is a general legacy. As if a legacy be of $1,000 00, deposited in a certain chest, bag or purse, or in the hands of A: 1 Atkins, 508; 1 P. W., 540; Pulsford *vs.* Hunter, 3 Brown's Chan. Cases, 416.

The whole inquiry is simply whether the testator intended to give a sum of money generally, referring to the fund merely as a mode of payment, or whether he intended to give either the whole or a part of a certain specific sum or fund.

In Page *vs.* Leapring, 18 Vesey, 463, the testator directed certain real estates to be sold for not less than £10,000. He then directed that out of the money arising from the sale,

£3,000 should be expended in buying a benefice for his godson, that £4,000 should be expended in buying certain lands for his nephew. He also gave out of this fund £500 to E., and three other legacies of £100 to three other persons, and he bequeathed the remainder of the fund to F. and G. The land brought only £7,000, and Sir W. Grant held the legacies dependent on the fund and not a charge on the whole estate : 18 Vesey, 463. So in Mayott *vs.* Mayott, 3 Brown's Chancery Cases, 125.

The testator, being a tenant from year to year of a certain farm, directed B. to carry on the farm and invest the net proceeds each year in the government funds, and when E., his nephew, became twenty-one, £1,500 of said proceeds and of the stock and crop, were given to E. The landlord who had given the lease, refused to permit B. to carry on the farm, and the Court held the legacy failed with the scheme.

These cases go upon the plain common-sense rule : that if the testator intend, from the whole will, to give to the legatee a sum of money, it is a general legacy, even though he do point out a specific fund out of which it shall be paid, since it is obvious that he may point out this fund, only because he wishes to add an additional security for the payment, a security upon which the legatee has a specific lien if the general assets fail and general legacies are compelled to abate. But if the testator, by his whole will, show that his intent is to give the money legacy only on condition that the fund will produce it, or if the intent be clear that he intends to give the fund, or a part of it, and that his mind is on the specific thing, and his intent is to dispose *of that,* the legacy is specific.

With these general principles to guide us, let us now consider the will of Mrs. Tennille. She was an old lady and her husband was an old man. They had but one living child. Her property was almost wholly in land and slaves. The bulk of it was a plantation, with stock and slaves upon it, in Quitman county. She directs her house in Columbus to be sold to pay her debts. She then directs that her plantation in Quitman shall be kept up and the slaves worked thereon by

Tennille *vs.* Phelps *et al.*

her executors, "*for the purposes hereinafter mentioned.*" *After this*, she gives the money legacies to the plaintiffs, and adds, immediately, "it is my desire, and I direct the foregoing bequests in this item mentioned shall be paid out of the profits and income of my plantation, *without interest*, whenever my executors shall see proper, and can conveniently spare the same, after paying all expenses necessarily arising from a prudent management of the plantation."

In the next item, she gives a legacy of $2,000 00 to another legatee, without qualification and without any direction as to how it shall be paid. She next disposes of certain lands and personal estate in Alabama, giving it specifically to the legatees. She then gives all the remainder of her estate, (which is the plantation and slaves directed before to be kept together and worked,) to her son, directing that her husband, who, with his brother, she appoints her executors, shall receive the *annual profits* during his life, in trust, without accountability, for her son; and she directs that he shall preserve *the corpus* for the son.

This is the scheme for the disposition of her property. She disposes of all of it specifically except the legacy to Tennille Patterson. The plantation and slaves in Quitman she designs for her son. But the son is but sixteen years old, and she wishes to provide for her husband and the present plaintiffs out of this, without affecting the *corpus* of it, and how does she do it? She first directs that the plantation shall be kept up, the slaves and stock worked upon it. She *then, after* she has provided a yearly fund *for the purposes* indicated, gives them legacies, and directs them to be paid out of this fund. She contemplates that it may take some time for the fund to furnish the money to pay; she remembers that there will be expenses and uncertainties affecting the profits made on the plantation, and she directs that these legacies, if delayed in their payment, by these expenses and uncertainties, shall *not draw interest*. Can any one for a moment fail to think that if the scheme could have been carried out—if the negroes and stock were now at work under the direction of the

executors, these legacies would have to await the accumulation of enough to pay them out of the profits, and get no interest in the meantime? If, for instance, there was only a yearly profit of $1,000 00, could they demand in any year more than that? Is it not plain that it was the intention of the testatrix that these legatees were not to be permitted to demand the sale of any portion of the *corpus* of her estate? If these are general legacies, the legatees would have a right to insist upon their payment as soon as there were funds in hand, after the payment of the debts, to pay them. Is it not clear that this *was not* the intention of the testatrix?

Does not the will show very clearly that she intended to make these legacies dependent upon the ability of this fund to discharge them? In terms she makes *the time* of their payment depend upon this. She contemplates it as entirely within the range of probabilities, that the profits of the plantation *will not* pay these legacies at once, and she directs that they shall not bear interest if they have to be for this reason postponed.

Taking all of this will together, we are of opinion that the testatrix intended this plantation and negroes to go to her son bodily, and that her legacies to the persons mentioned in this item were intended to be specific legacies and dependent upon the success of her scheme of keeping up her plantation and working the negroes thereon.

This scheme has failed. It is impossible to carry it out. We think the legacies fell with it. We think it was her intent that her son should have all of her estate, not specifically bequeathed away, except the legacy to Tennille Patterson, though she intended that if the income arising from the working of the slaves on the plantation should be sufficient to pay these legacies in the fifth item, they should be so paid, but not otherwise. We think this was the clear intent of the testatrix, and that this intent is not only such as subsequent events have shown to be material, but that such intent is plainly made known by the words of her will.

Judgment reversed.